UNITED STATES DISTRICT COURT **FILED**
DISTRICT OF CONNECTICUT

2004 APR -7 P. 4: 55

Robert Reid

Plaintiff.

Civil Action No.

U.S. DISTRICT COURT
BRIDGEPORT, CONN    Docket No: 03 CV0208 (JCH)

v.

John Armstrong, et al.,

Defendants.

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION

FOR SUMMARY JUDGMENT

Now comes Robert Reid the Plaintiff in his status of pro se. submits this memorandum of Law in support of his motion for summary judgment. As shown below, the defendants have no disputed issues of material fact, and the Plaintiff is entitled to Judgment as a matter of law.

## I. FACTUAL BACKGROUND

The plaintiff, Robert Reid, is a sentenced inmate from New Hampshire serving time in a Connecticut Correctional Institution at Corrigan, C.I., and serving a ten to thirty year sentence imposed by Merrimack Superior Court in New Hampshire for Second Degree Assault. see (Ex-A), and pursuant to the Interstate Correction Compact Codified at C.G.S. §§ 18-105, et seq., which refers to the Contract for the implementation of the Interstate Corrections Compact. Appended hereto as (Ex-B) Notable paragraph (2). The defendants, at the time of this action all were employees of the Connecticut Department of Correction were John Armstrong, the Doc Commissioner; George Wezner, Lead Warden of Corrigan, C.I.; Joanne Borden, the Correctional Counselor Supervisor at Corrigan, C.I.; Gary Credit, the Correctional Counselor at Corrigan, C.I.

Prior to plaintiff being transferred to Connecticut DOC he was a maximum custody (C-5) inmate the highest security classification in New Hampshire State Prison System were his status was reviewed every (90) days.

-1-

The Connecticut Department of Corrections from the time plaintiff Arrived At Corrigan, C. I. in March 23, 2001 until September 1, 2001 when he received his First Disciplinary was denied level Reductions because of the remaining time left on his maximum sentence, and the fact he had not received a firm vote to parole date, See defendants Answer and Affirmative Defense under ARGUMENT #14: Admitting that paragraph #14 of Plaintiff's complaint as being true. From approximately January 1, 2002 when the September 1, 2001 Disciplinary Report would have cleared the (120) day requirement to Apply for level reduction reclassification to February 3, 2003 when plaintiff received his next disciplinary Report Connecticut official never review my status to my knowledge See Affidavit of Robert Reid at para. 4, and (Attachment-1) Thereof. The fact plaintiff would not be reviewed for level reduction until such time he secure an firm vote to parole date foreclose any opportunity for him getting into a minimum security halfway house status. And the fact he has approximately (15) years left to discharge also prohibits him from securing a halfway house status when the inmate has to be (18) months of there discharge date to be eligible.

## II.  ARGUMENT

### A. Standards of Review

#### 1. Summary Judgment Standard

Summary judgment "Shall be rendered forthwith if the pleadings, depositions, Answers to interrogatories, and admissions on file, together with affidavits, if any, Show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed. R. Civ. P., § 56 (c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of Summary judgment." Anderson v. Liberty-Lobby, Inc. 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). See Also, Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curtam). A party may not rely "on mere speculation or conjecture as to the nature of the facts to overcome a motion for Summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) cert denied 480 U.S. 932, 107 S.Ct. 1570 (1987). The party opposing a motion for Summary judgment "may not rest upon the mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P., § 56 (e).

In discussing the history and propriety of summary judgment motions, the Supreme Court has explained:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule Civ. Proc. 1 ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.265(1986).

A party is not permitted to create his own "genuine" issue of fact simply by presenting contradictory or unsupported statements. See Securities and Exchange Commission v. Research Automation Corp., 585 F.2d 31, 33(2d Cir. 1978). Thus, "[w]here the record could not lead a rational trier of facts to find for the nonmoving party, there is then no 'genuine issue for trial.'" Clements v. County of Nassau, 835 F.2d 1000, 1004(2d Cir. 1987).

The record in this case, even when considered in a light most favorable to the defendants, fully supports the granting of summary judgement in favor of the plaintiff.

B. The Plaintiffs' Motion For Summary Judgment Should Be Granted Because of The Personal Involvement Of Defendants Armstrong, Wezner, Borden, And Credit.

As an initial matter, the plaintiff note that the record reflects evidence that defendants were personally involved when they were aware of there constitutional deprivation and did nothing to correct it. See Affidavit of Robert Reid para. 14, and Complaint and Exhibits. Surely puts their personal involvement squarely in connection with plaintiffs' claims. "[P]ersonal involvement of defendants in alleged constitutional deprivation is a prerequisite to an award of damages under §1983." McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977) cert. denied 434 U.S. 1087(1978). "A plaintiff must thus allege a tangible connection between the acts of a defendant and the injuries suffered." Bass v.

-3-

Jackson, 790 F.2d 260, 263 (2d Cir. 1986). It was clear that defendant Armstrong as commissioner of corrections was at the time responsible for the administration of the Interstate Corrections Compact. C.G.S § 18-104, and said Compact was enacted into law. C.G.S. § 18-106. Article III Contracts provides that any one or more of the party state may confine inmates on behalf of a sending state. see (Exhibit-B). Although plaintiff was denied regulatory, and other legal rights a maximum security inmate would received in New Hampshire according to C.G.S § 18-106 Article. IV (C),(d),(e),(f)(h). these shortcomings were brought to the Attention of Armstrong through plaintiffs Appeal of the classification procedures, which was forwarded to the Commissioner office. see Compl. (Ex. C) also Affidavit Robert Reid para. 14. Werner denied this Appeal stating "All classification transactions are governed by Connecticut classification objectives, not New Hampshires". see Werner denial Appended hereto as (Ex-C). This is contrary to the defendants Contract for the implementation of the Interstate Corrections Compact para. 2, 10. Appended hereto as (Ex-B). The New Hampshire Department of Corrections Classification Handbook (hereinafter-"N.H.D.O.C.C.H") is the policy followed managing inmates levels, and which would have applied to plaintiff in order to progress down through the Classification levels. But as stated Above the only classification procedures that would Apply to plaintiff is those of Connecticut, which according to the Classification Administrative Directive 9.2 Appended hereto as (Ex-d) is the guiding regulations for Connecticut inmates, which defendants informed me before any level reductions I must first Achieve a firm vote to parole date.

Plaintiff was never involved in any program decisions, and was not seen by Counselor Credit or Borden for objective classification Actions or his Percentage-of-time Review which was denied nor did I receive 48 hour notice in advance of Any review to be conducted see (Ex-d) Appended hereto ▮▮▮▮ Administrative Directive (hereinafter- "A.d.") 9.2 (15). Although the defendants claim that plaintiff received Classification Reviews on July 2, 2001, and July 6, 2001, documentation supports that his percentage-of-time Review was conducted the ▮▮▮ 26th of June 2001 or the week of, which plaintiff did not Attend. see (Ev-E) Appended hereto.

Defendant based their denial of the percentage-of-time Review on A.d. 9.2 ▮▮▮ 10.2 which provides parole status shall only be considered when a firm vote to parole (VTP) date has been granted by the parole Board see (Ex-d) Appended hereto.

Connecticut conduct ▮▮▮▮ there Regular Reclassification for maximum Custody and/or Level-4 inmates Are every year (12 months) A.d. 9.2- 10.A; Contrary to New Hampshires Classification System Connecticut based plaintiffs eligibility for Residential program Placement/Halfway House on maximum sentence or an Afirmed vote to ▮▮ parole date. see (Ex-d) Appended hereto at 9.2.11 b.1.

-4-

Plaintiff as a maximum inmate should had been classified according to the laws and regulations of New Hampshire state Prison as pointed out pursuant to the So New England Corrections Interstate Compact. RSA. 622-A:2 Article. IV Procedures and Rights. See Compl. (Attachment-1). It is plaintiffs' right as a maximum custody inmate (CC-5) to have the opportunity to have advanced notification of any Reclassification Board and guided pursuant to the N.H.D.O.C. C.H. Sect. III. A. 1. Contrary to Connecticut Classification procedures of Classifving there maximum custody inmate once a year, New Hampshire conduct Classification Reviews every 3 months see NHDOCCH. Sect. III. A. 1. (a)(b)(c). pg. 53 The N.H.D.O.C.C.H. is appended hereto as (Ex-F). Its clear that by New Hampshire Classification procedures plaintiff with less then (3) years until his minimum Parole date of February 16, 2002 went from 9-13-98 the first Dis-ciplinary Report, with the second being 9-1-01, even though plaintiff did not receive any Disciplinary Reports between these dates No Change was made in his status Nor was he review Accordingly see N.H.D.O.C.C.H. III. C. 2; Institutional Risk (I-Rating) Changes, And Behavior. see (Ex-F) Appended here-to. New Hampshire criteria for an inmate to be eligible for Community Corrections/halfway House is that the inmate must be within Nine (9) months of parole eligibil-ity date, also the inmate must be eligible for C-1 placement see N.H.D.O.C.C.H. III. C. 1. b. Appended hereto as (Ex-F). New Hampshire Reduced Custody Programs de-fines the Levels of Reduced Custody and its purpose, which plaintiff would have had the opportunity if confined in the sending state see (Ex-F) appended hereto at pg. 64 sect. K. 1, And sects. K.1.c; K.1.d; on pg. 65. The requirement for plaintiff for gaining reduced custody And the restriction on those requirement are being Disciplin-ary Free for Class A offense for 60-days period prior to a Review, and a 30-day period for minor offenses B+C disciplinary Report before a Review. See (Ex-F) appended here-to at pg. 66 sect. K. 2, 3, And 4; It is clear for purposes of parole it is ab-surd to think Connecticut Classification procedures which are substantially dif-ferent from those of New Hampshire to Apply to plaintiff when he is still under the Authority of New Hampshire. see (Ex-F) Appended hereto as at pg. 90 sect. V. Tran-sfer. Also petition para. 26 (Attachment-1) Thereto; & RSA 622-A:2 Article. IV sect. (e), (f).

C.   Defendants Failure To Consider Plaintiffs Minimum Parole Date Instead OF HIS MAXIMUM AND REQUIRING A VOTE TO PAROLE DATE Denied HIS Potential Eligibility FOR MINIMUM Classification and Possibility OF Parole Creates a Liberty Interest IN Which Due Process IS REQUIRED.

To articulate a claim under 42 U.S.C § 1983 alleging the violation of a liberty interest without procedural due process, an inmate must first establish that he enjoyed a protected liberty interest. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460, 104 L. Ed. 2d 506, 109 S.Ct. 1904(1989). Inmates' liberty interests are typically derived from two sources, the Fourteenth Amendment Due Process Clause and State statutes or regulations. Id. Arce v. Walker, 139 F. 3d 329, 333 (2d cir. 1998).

Interests arising directly under the due process clause are in scope, protecting no more than "the most basic liberty interests in prisoners."' Id. The due process clause standing alone "does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." Sandin, 515 U.S. at 478. Rather, the due process clause protects against restraints or condition of confinement that "exceed[] the sentence in ... an unexpected manner." Id. At 484.

With regard to state-created liberty interests, the Supreme Court in Sandin refocused the inquiry from whether a mandatory directive in a state statute or regulation created a liberty interest to the "nature of the deprivation" itself. See Sandin, 515 U.S. at 481-484.

[I]n Sandin, the Supreme Court explicitly held that disciplinary confinement does not deprive an inmate of a liberty interest unless the confinement imposes an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison life. Miller v. Selsky, 111 F.3d 7 (2d cir. 1997). Also "The Plaintiff can prevail only if the evidence of record is legally sufficient to support his claim." Sealey v. Giltner, 197 F. 3d 578 (2d cir. 1999). Plaintiff here, claims that because of Connecticut prison official failure to provide proper Classification Reviews in which other inmate in New Hampshire were entitled according to there sentence there, lengthened his sentence because Connecticut classification procedures otherwise differed from that of New Hampshire from which he came. Second, plaintiff detention in Connecticut imposes atypical and significant hardship on him in relation to the ordinary incidents of prison life in New Hampshire.

However plaintiff, unlike the plaintiff in Sandin, cannot achieve parole without first succeeding to a minimum security placement. Unlike the disciplinary conviction in Sandin, plaintiff's per se ineligibility for minimum security in Connecticut is dispositive of his fate as to parole. Although success in achieving the classification would not be sufficient to guarantee plaintiff's release, but minimum security is a necessary prerequisite for consideration for parole. See Carillo v. DuBois, 23 F. Supp. 2d 103, 109 (D. mass.

1998) Cf. <u>Knox v. Lanham</u>, 895 F. Supp. 750, 757 (D. Md. 1995), aff'd sub Nom. <u>Worsham v. Lanham</u>, 76 F. 3d 377 (4th cir. 1996); Also see <u>Brennan v. Cunningham</u>, 813 F. 2d 1 (1st cir. 1987). Similar Circumstances.

### D. The Plaintiff was Not Afforded Appropriate Hearings While Confined At Corrigan, C.I. Level-4 (Maximum) Security Institution In The State of Connecticut And/or Notice

As discussed Above, the plaintiff was Not afforded Notice or hearings during his confinement At Corrigan, C.I. A Maximum Custody Institution, and the fact he was denied periodic reviews of his Classification Status by hearing effected his progress through its System and eventually the possibility of parole. It should be noted under both N.H., and Ct. Classification procedures Advance written Notice is required of objective Classification boards, and both provide the Inmate with the chance to present documentation /and or evidence, and both are required to present to the inmate a written Statement by the factfinder. In determining the due process due under the Fourteenth Amendment, we must consider whether the present case should be subjected to the Kind of process outlined in <u>Morrissey v. Brewer</u>, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (Parole); <u>Hewitt v. Helms</u>, 459 U.S. at 472-73, 103 S. Ct. At 871-72 (administrative segregation), or <u>Wolff v. McDonnell</u>, 418 U.S. At 563-67, 94 S. Ct. At 2978-80 (good time credits). Plaintiffs case is closely related to that of Wolff because of interests involved here. If one was to consider Hewitt, There is no indication that Administrative segregation will have any significant effect on parole opportunities. See Hewitt, 459 U.S. at 473; 103 S. Ct. At at 872.

The denial by Connecticut Prison officials of reduce custody, and the fact that New Hampshire places substantial amount of there classification Manual along with the parole board who does Not parole inmates from Maximum Custody And required plaintiff secure Minimum Custody Status (Halfway House) before he would be see bears a quite similar, though not identical, relationship to his liberty interests as the revocation of good time Credits. The New Hampshire Classification Manual is related to giving the prisoner an opportunity to establish his readiness for accelerated release from prison.

Wolff, 418 U.S. At 561-62. In balancing the interests of inmates and correctional Staff, the Court held that due process requirements are met by providing an inmate with written Notice of charges against him, an opportunity to call and question witnesses in his defense, and A written Statement of the action taken by the prison administrators and the evidence relied upon Id. At 563-64. All Advance written

Notice of classification hearings was denied while in Ct. Nor was I able to be present ~~what~~ to testify in my own defense, and a written statement of the action taken by the prison administrators and the evidence relied upon. Id. at 563-64.   Thus, Plaintiff never received a hearing that comported with the standard set forth in Wolff. Accordingly, the plaintiff did not receive any hearings that fully satisfied the standard established by Wolff, and therefore, the plaintiffs' motion for summary judgment should be granted.

Alternatively, it should also be noted that, not only can the plaintiff demonstrate that he has an adequate remedy at law, but he will also be able to demonstrate the likelihood of success on the merits of this action. Plaintiffs stay in Connecticut as a matter of law, implicates a liberty interest. And to the extent the plaintiff was entitled to notice and an opportunity to be heard for classification purposes the DOC hearing procedures did not comport with the due process standard set forth in Wolff. Again, for the reason cited above, it is likely that the Plaintiff will succeed on the merits of his claims.

## III. CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment should be granted and hearing for relief conducted.

Respectfully Submitted,

*Robert Reid*

Robert Reid · pro se · Plaintiff
Corrigan, C.I.
986 Norwich-New London toke
Uncasville, ct. 06382

DATED: 3-31-04

## CERTIFICATION

I hereby certify that a copy hereof was mailed this ~~day~~ 31st day of March, 2004 to Terrence M. O'Neill at 110 Sherman Street Hartford, ct. 06105.

*Robert Reid*

Robert Reid · Plaintiff

-8-

Exhibit
A

# The State of New Hampshire

MERRIMACK ———— County                     Superior Court

89-S-695

## RETURN FROM SUPERIOR COURT

Name  ROBERT REID                                                    DOB  4-21-62

☒ Indictment      ☐ Waiver      ☐ Information      ☐ Complaint
                              (COPY ANNEXED HERETO)

Offense  SECOND DEGREE ASSAULT                              Date  8-26-89

Disposition:  ☒ Guilty By      ☐ Plea      ☒ Jury      ☐ Court      ☐ Nol Pros

Sentence:      The defendant is sentenced to the New Hampshire State Prison for not
more than thirty (30) years, nor less than ten (10) years.  Pretrial confine-
ment credit two hundred seventy-four (274) days.

JUN 5 1990
RECEIVED

☒ Disciplinary period pursuant to RSA 651:2 II-e

  6-1-90                ROBERT E. K. MORRILL                    Marshall A. Buttrich
   Date                     Presiding Justice                                      Clerk

## MITTIMUS

In accordance with this sentence, the Sheriff is ordered to deliver the defendant to:
                    ☒ NH State Prison          ☐ County House of Correction
    Said institution is required to receive the Defendant and detain him/her until the Term of Confinement has
expired or ☒/he is otherwise discharged by due course of law.

  6-1-90                                                Attest  Marshall A. Buttrich
   Date                                                                              Clerk

## SHERIFF'S RETURN

I delivered the defendant to      ☒ NH State Prison        ☐ County House of Correction and gave a copy of
this order to the      ☒ Warden         ☐ Superintendent.

  6-4-90
   Date                                                                              Sheriff

cc: ☐ State Police OR:              ☐ Dept. of Corrections
    ☐ Division Motor Vehicle        ☐ District Court
    ☐ Prosecuting Attorney          ☐ Defendant
    ☐ Defense Counsel               ☐ Sheriff

Exhibit
B

### CONTRACT FOR THE IMPLEMENTATION OF
### THE INTERSTATE CORRECTIONS COMPACT

In consideration of the cooperative relationship herewith undertaken in the confinement, care, treatment and rehabilitation of inmates on an interstate basis and in further consideration of services to be performed and benefits to be derived by each of the parties hereto in the strengthening of their respective correctional programs, the State of Connecticut and the State of **New Hampshire** acting herein by their duly constituted authorities, and pursuant to and to implement the Interstate Corrections Compact enacted by each of the parties herewith do hereby covenant and agree as follows:

1. Interstate Corrections Compact

The provisions of the Interstate Corrections Compact are hereby made an integral part of this contract and no provision of this contract shall be construed in any manner inconsistent with said Compact.

2. Governing Law

Except where expressly otherwise provided, the laws and administrative rules and regulations of the sending state shall govern in any manner relating to an inmate confined pursuant to this contract and the Interstate Corrections Compact.

3. Terminology

All terms defined in the Interstate Corrections Compact and used in this contract shall have the same meanings in this contract as in said Compact. The terms "sending state" and "receiving state" shall be construed to include and refer to the appropriate official or agency thereof in each particular case.

4. Duration

This contract shall enter into full force and effect on 7/1/85 and shall terminate in accordance with paragraph 5.

5. Termination

This agreement may be terminated by notice of either party. That termination shall become effective ninety (90) days after receipt of said notice. Within a reasonable time of receipt of said notice, the sending state shall accept delivery of its inmates at the institution designated by the receiving state.

### 6. Other Arrangements Unaffected

Nothing contained in this contract shall be construed to abrogate or impair any agreement or contract for the confinement, rehabilitation or treatment of inmates now in effect between the parties to this contract.

### 7. Mailing Addresses

All notices, reports and correspondence to the respective states to this contract shall be sent to the following:

Cynthia T. Morse                    Mary Kaniston
Supervisor of Interstate Matters    Deputy Compact Administrator
Department of Correction            Department of Correction
340 Capitol Avenue                  P.O. Box 769
Hartford, CT 06106                  Concord, New Hampshire 03301

### 8. Right of Inspection

The sending state shall have the right to inspect, at all reasonable times, any institution of the receiving state in which inmates of the sending state are confined in order to determine if that institution maintains standards of care and discipline not incompatible with those of the sending state and that all inmates therein are treated equitably, regardless of race, religion, color, creed or national origin.

### 9. Vacancies

The receiving state hereby undertakes to make available to the sending state such places for inmates as may be vacant from time to time in any and all institutions of the receiving state made available for such confinement by the laws of the receiving state.

### 10. Application

The sending state will submit a separate application to the receiving state for each individual inmate proposed for commitment.

Said application shall consist of the following:  Full information and all necessary documents relating to the case history, physical and clinical record, judicial and administrative rulings and orders relating or pertinent to the inmate and the sentence or sentences pursuant to which confinement is to be had or to continue, and reasons for the requested transfer.

Commitment will be deferred until approved by the receiving state.

### 11. Delivery of Inmate

Upon receipt of the acceptance of the application the sending state at its expense will deliver the inmate to the institution in the receiving state designated by the receiving state, together with the original or a duly authenticated copy of his commitment, and any other official papers or documents authorizing detention.

Whenever there is to be a mutual exchange of inmates between the parties to this contract, the authorities of one of the states may act as the agent of the other state for purposes of transferring its inmates so that the expenses to both states may be minimized.

## 12. Transfer of Funds

Funds due transferred inmates shall be provided by the sending state to be credited to the account of the transferred inmate in the receiving state. Upon the return of the inmate to the sending state, or upon his release, the receiving state shall provide funds in the amount due the inmate at the time of return or release.

## 13. Responsibility for Offenders Custody

It shall be the responsibility of the administration of the institution in the receiving state to confine inmates from a sending state; to give them care and treatment, including the furnishing of subsistence and all necessary medical and hospital services and supplies; to provide for their physical needs; to make available to them the programs of training and treatment which are consistent with their individual needs; to retain them in safe custody; to supervise them; to maintain proper discipline and control; to make certain that they receive no special privileges and that the sentences and orders of the committing court in the sending state are faithfully executed. But nothing herein contained shall be construed to require the receiving state or any of its institution to provide treatment, facilities or programs for any inmate confined pursuant to the Interstate Corrections Compact which it does not provide for similar inmates not confined pursuant to said Compact.

## 14. Medical Services

(a) Inmates from the sending state shall receive such medical, psychiatric and dental treatment as may be necessary to safeguard their health and promote their adjustment as self-supporting members of the community upon release. Unless an emergency is involved, the receiving state shall contact the sending state for advance authority in writing before incurring medical, psychiatric, or dental expense for which the sending state is responsible under the terms of this contract. In an emergency, the receiving state may proceed with the necessary treatment without prior authority, but in every such case the receiving state shall notify the sending state immediately and furnish full information regarding the nature of the illness, the type of treatment to be provided and the estimated cost thereof.

(b) When medical, psychiatric or dental care or treatment requires the removal of the inmate from the institution, the inmate shall be removed only after notification to the sending state. In the event of an emergency which does not permit prior notification, the institution shall notify the sending state as promptly thereafter as practicable. All necessary precautions shall be taken to assure the safe-keeping of the inmate while he is absent from the normal place of confinement. Necessary custodial supervision shall be provided by the receiving state.

-4-

(c) Any costs of medical, psychiatric or dental service shall be considered normal costs incidental to the operation of the institution in the receiving state if the service is rendered by staff personnel and in regularly maintained facilities operated or utilized by the institution as part of the health or correctional program thereof and if the inmate requires no special medication, drugs, equipment, anesthetics, surgery or nursing care in addition to that commonly available on an infirmary basis. The costs of any extraordinary services, medication, equipment, surgical, or nursing care shall be chargeable to the sending state.

15.  Training or Employment

(a) Inmates from the sending state shall be afforded the opportunity and shall be required to participate in programs of occupational training and industrial or other work on the same basis as inmates of the receiving state. Compensation in connection with any such participation (whether as payment, incentive, or for any other therapeutic or rehabilitative reason) shall be paid to inmates of the sending state on the same basis as to inmates of the receiving state. Any such inmates of the sending state shall be subject to the regular work discipline imposed upon other inmate participants in the particular program. However, nothing contained herein shall be construed to permit or require any inmate of a sending state to participate in any training, industrial or other work program contrary to the laws of the sending state.

(b) The receiving state shall have the right to dispose of all products produced by an inmate, shall retain all proceeds therefrom, and shall bear all costs of said program.

(c) In the case of handicraft or hobbycraft programs, the inmate shall have the right to dispose of the products of his labor and to retain the proceeds of any sale of his work in accordance with the rules of the receiving state.

16.  Discipline

The receiving state, as agent for the sending state, shall have physical control over and power to exercise disciplinary authority over all inmates from sending states. However, nothing contained herein shall be construed to authorize or permit the imposition of a type of discipline prohibited by the laws of the sending state.

17.  Laws and Regulations

Inmates while in the custody of the receiving state shall be subject to all the provisions of law and regulations applicable to persons committed for violations of law of the receiving state not inconsistent with the sentence imposed.

-5-

### 18. Records and Reports from Receiving State

(a) Within          days following the receipt of an inmate from the sending state, the receiving state shall furnish an admission classification report outlining the inmate's social background, medical, psychiatric, education and vocational findings and indicating the institutional program which has been recommended. Thereafter, preferably at intervals of six months, but at least annually, the receiving state shall furnish the sending state a report giving a summary of the inmate's progress and adjustment since the last report, including a recommendation for retention or return. All such reports shall be forwarded to the sending state.

(b) The superintendent or other administrative head of an institution, in which inmates from sending states are confined, shall keep all necessary and pertinent records concerning such inmates in a manner agreed between the sending and receiving states. During the inmates' continuance in the institution, the sending state shall be entitled to receive, and upon request shall be furnished, with copies of any such record or records. Upon termination of confinement in the institution, the sending state shall receive the complete file of the inmate. But nothing herein contained shall be construed to prevent the receiving state or any institution thereof from keeping copies of any such record or records upon and after termination of confinement.

### 19. Removal from Institution

An inmate from the sending state legally confined in the institutions of the receiving state shall not be removed therefrom by any person without an order from the sending state. This subdivision shall not apply to an emergency necessitating the immediate removal of the inmate for medical, dental or psychiatric treatment or to a removal made necessary by fire, flood, earthquake or other catastrophe or condition presenting imminent danger to the safety of the inmate. In the case of any removal for such emergency cause, the receiving state shall inform the sending state of the whereabouts of the inmate or inmates so removed at the earliest practicable time, and shall exercise all reasonable care for the safekeeping and custody of such inmate or inmates.

### 20. Hearings

The receiving state shall provide adequate facilities for any hearing by authorities of the sending state, to which an inmate may be entitled by the laws of the sending state. Upon the request of the sending state, the authorities of the receiving state will be authorized to and will conduct any such hearings, prepare and submit the record of said hearings, together with any recommendations of the hearing officials, to the officer or officers of the sending state before whom the hearing would have been had if it had taken place in the sending state.

### 21. Inter-institutional Transfers

Notwithstanding any provision herein to the contrary, the receiving state may transfer an inmate from one institution under its control to another whenever it deems such action appropriate. Notice of such transfer shall immediately be sent to the sending state.

-6-

## 22. Escape

In case of any such inmate shall escape from custody in the receiving state, that receiving state will use all reasonable means to recapture the inmate. The escape shall be reported immediately to the sending state. The receiving state shall have the primary responsibility for the authority to direct the pursuit and retaking of inmates within its own territory. Any costs in connection therewith shall be chargeable to and borne by the receiving state.

## 23. Death of Inmate

(a)   In the event of the death of an inmate from a sending state, the medical examiner, coroner or other official having the duties of such an officer in the jurisdiction shall be notified. The sending state shall receive copies of any records made at or in connection with such notification.

(b)   The institution in the receiving state shall immediately notify the sending state of the death of an inmate, furnish information as requested, and follow the instructions of the sending state with regard to the disposition of the body. The body shall not be released except on order of the appropriate officials of the sending state. All expenses relative to any necessary preparation of the body and shipment or express charges shall be paid by the sending state. The sending and receiving states may arrange to have the receiving state take care of the burial and all matters related or incidental thereto and all such expenses shall be paid by the sending state. The provisions of this paragraph shall govern only the relations between or among the party states and shall not affect the liability of any relative or other person for the disposition of the deceased or for any expenses connected therewith.

(c)   The sending state shall receive a certified copy of the death certificate for any of its inmates who have died while in the receiving state.

## 24. Gratuities and Expenses Attendant Upon Release

The provision of clothing, gratuities and any other supplies upon release of an inmate shall be at the expense of the sending state and shall be in accordance with its laws.

## 25. Retaking of Inmates

The receiving state will deliver any of said inmates to the proper officials of the sending state upon demand made to the receiving state and presentation of official written authority to receive said inmate.

The sending state will retake any inmate, upon the request of the receiving state, within thirty (30) days after receipt of the request to retake.

In case the commitment under which any of said inmates is terminated for any reason, the sending state agrees to accept delivery of the inmate at the institution of the receiving state, and at its expense return him to the jurisdiction

-7-

of the sending state. However, by agreement among the sending and receiving states and the inmate, at the termination of his confinement by reason of discharge, conditional or otherwise, he may be released within the jurisdiction of the receiving state.

26. Photographing and Publicity

Institutional or other officials of the receiving state shall not be authorized to release publicity concerning inmates from the sending state. They shall not release personal histories or photographs of such inmates or information concerning their arrival or departure or permit reporters or photographers to interview or photograph such inmates. Requests for information regarding inmates of sending states shall be referred to the sending state. However, information of public record, such as sentence data or information concerning the escape of an inmate may be given directly to the press by the receiving state. The receiving state may photograph inmates from the sending state as a means of identification for official use only.

27. Costs and Reimbursement

In addition to costs and reimbursement required by other provisions of this contract, the sending state shall pay to the receiving state for the custody treatment and rehabilitation of each transferred inmate the sum of  0.00 dollars per day; except that there shall be no reimbursement if there is an equal exchange of prisoners among the contracting states, for the duration of the period of the exchange. The sending state shall be billed monthly for such costs.

28. Transportation

Any and all costs of transportation incurred prior to admission to an institution in the receiving state, and transportation at the time of, or as an incident to release or discharge, conditional or otherwise, shall be charged to the sending state.

29. Responsibility for Legal Proceedings

The transfer of an inmate pursuant to this contract shall not effect the obligation of the states involved to provide legal representation for state officers and to respond to any relief which may be involved. Legal representation other than as stated herein shall be available only upon the consent of the state involved.

30. Discrimination

The contractor agrees and warrants that in the performance of this contract he will not discriminate or permit discrimination against any person or group of persons on the grounds of race, color, religious creed, age, marital status national origin, sex, MENTAL RETARDATION or physical disability, including, but not limited to, blindness, unless it is shown by such contractor that such disability

-8-

prevents performance of the work involved in any manner prohibited by the laws of the United States or of the State of Connecticut. If the contract is for a public works project, the contractor agrees and warrants that he will make good faith efforts to employ minority business enterprises as subcontractors and suppliers of materials on such project. The contractor further agrees to provide the Commission on Human Rights and Opportunities with such information requested by the Commission concerning the employment practices and procedures of the contractor as relate to the provisions of this section and section 46a-56 as amended.

"This contract is subject to the provisions of the Executive Order No. Three of Governor Thomas J. Meskill promulgated June 16, 1971 and, as such, this contract may be cancelled, terminated or suspended by the State Labor Commissioner for violation of or noncompliance with said Executive Order No. Three, or any state or federal law concerning nondiscrimination, notwithstanding that the Labor Commissioner is not a party to this contract. The parties to this contract, as part of the consideration hereof, agree that said Executive Order No. Three is incorporated herein by reference and made a part hereof. The parties agree to abide by said Executive Order and agree that the State Labor Commissioner shall have continuing jurisdiction in respect to contract performance in regard to non-discrimination, until the contract is completed or terminated prior to completion."

"This contract is subject to the provisions of Executive Order No. Seventeen of Governor Thomas J. Meskill promulgated February 15, 1973, and as such, this contract may be cancelled, terminated or suspended by the contracting agency or the State Labor Commissioner for violation of or noncompliance with said Executive Order No. Seventeen is incorporated herein by reference and made a part hereof. The parties agree to abide by said Executive Order and agree that the contracting agency and the State Labor Commissioner shall have joint and several continuing jurisdiction in respect to contract performance in regard to listing all employment openings with the Connecticut State Employment Service."

## 31. Internal Relations

Nothing in this contract shall be construed to affect the internal relationships between or among the party states and their subdivisions, officers, departments or agencies, but each party state undertakes and acknowledges liability and responsibility for making each other party state whole in respect of any obligation imposed upon it by or pursuant to this contract.

## 32. Performance

Performance under the terms of this contract will not begin until said contract has been approved by the department of Finance and Control and the Attorney General with the State of Connecticut.

Statutory Authority:  Public Act 73-354 (1973 Session) General
                      Assembly, State of Connecticut.

        IN WITNESS WHEREOF, The undersigned duly authorized
officers have subscribed their names on behalf of the State of
Connecticut and the State of ___New Hampshire___, this _3ud_
day of ___may___ 19 _85_.

STATE OF CONNECTICUT                    STATE OF ___New Hampshire___
DEPARTMENT OF CORRECTION

_____               _____
Commissioner                            Commissioner

Date: ___4·22·85___                     Date: ___5/3/55___

APPROVED: _____

_____
Office of Policy and Management         _____

Date: ___JUL 3 1985___                  Date: _____



Approved As To Form

_____               _____
Attorney General

Date: ___JUL 5 1985___                  Date: ___May 17, 1985___





# STATE OF CONNECTICUT
## DEPARTMENT OF CORRECTION
### *Corrigan-Radgowski Correctional Center*
**986 NORWICH-NEW LONDON TURNPIKE**
**UNCASVILLE, CONNECTICUT 06382**



Exhibit C

*John Armstrong*
*Commissioner*

*George K. Wezner*
*Lead Warden*

July 19, 2001

Robert Reid  # 262849  B-206
RE:  Denial of Level Reduction

Dear Mr.Reid:

I have received your appeal on the denial of your level reduction.

I have reviewed your file and concur with the decision to deny your level reduction at this time.  You are a New Hampshire inmate; however, all Classification transactions are governed by Connecticut's Classification objectives, not New Hampshire's.  You were denied based the fact that you have an indefinite sentence of ten (10) to thirty (30) years for assaultive charges with a lengthy amount of time left on your sentence and no firm voted to parole date.

You were also informed that you would be reviewed once you receive a firm voted to parole date.  Your level reduction was forwarded to the Interstate office for their records.  If you have any questions regarding the above, you need to contact the Interstate office.

Again, I concur with the decision and urge you to partake in all afforded programming at this facility.

Sincerely,

George K. Wezner
Lead Warden

CC;    Master file

GKW/jb

*An Equal Opportunity Employer*

Exhibit

d



# Administrative Directives Revision Form
## Connecticut Department of Correction

| Number | 9.2 | Title | Inmate Classification |
|---|---|---|---|

**Summary of revisions:**

Section 2(A) added and deleted referenced statutes

Section 3(B) and (C) were modified slightly

Section 3(F) was deleted

Section 7 was changed with technical revisions

Section 7 E added language about receiving juvenile offenders

Sections 8(A) and (B) were put in outline form

Section 8(C) added language regarding the determination of an overall risk score

Section (D) added the Director of Population Management and Offender Classification
Section 9 was re-worded for clarification and deleted the last paragraph

Section 10 was re-worded for clarification

Section 10(B)(1) deleted the last sentence

Section 10(B)(2) added language with regard to risk level reviews for inmates sentenced
to life without parole.  Language was also added regarding level reduction computation.

Section 10(B)(4) was put in outline form

Section 10(B)(5) added language that references the denial of level reductions if
programming needs and requirements are not met.

Section 10(B)(6) Deleted the last two sentences
Sections 11(A)(1) and (B)(1) were put in outline form and criteria was modified to
coincide with Classification Manual

Section 11(A)(2) has technical changes

Sections 11(C) and (D) were deleted

Section 12(B) deleted last sentence

Sections 12(D) and (E) have technical revisions

| Revisions are: | ☑ Modification | | ☐ Recision |
|---|---|---|---|
| Approved | | Date | 3/5/03 |

| State of Connecticut Department of Correction | DIRECTIVE NUMBER 9.2 | EFFECTIVE DATE March 5, 2003 | PAGE 1 OF 12 |
| --- | --- | --- | --- |
| **ADMINISTRATIVE DIRECTIVE** | SUPERSEDES: Inmate Classification – 1/12/98 | | |
| APPROVED BY [signature] 3/5/03 | TITLE: Inmate Classification | | |

1. **Policy.** Each inmate under the custody of the Commissioner of Correction shall be classified to the most appropriate assignment for security and treatment needs to promote effective population management and preparation for release from confinement and supervision. The Department's classification of inmates shall normally utilize a classification instrument based on objective factors. The classification system shall not foster discrimination in status, including housing, programming, job assignment, or on the basis of race, creed, color, or national origin.

2. **Authority and Reference.**

    A. Connecticut General Statutes, Sections 14-227(a), 14-215(c), 18-73, 18-81, 18-86, 18-100, 18-100c, 21a-277(d) and 21a-279(e).

    B. American Correctional Association, Standards for Adult Correctional Institutions, Third Edition, January 1990; Standards 3-4273, 3-4282 through 3-4285, 3-4287 and 3-4288 through 3-4292.

    C. American Correctional Association, Standards for Adult Local Detention Facilities, Third Edition, March 1991; Standards 3-ALDF-4B-01 through 3-ALDF-4B-04.

    D. Administrative Directives, 6.4, Transportation and Community Supervision of Inmates; 6.6, Reporting of Incidents; 6.14, Security Risk Groups; 9.4, Restrictive Status; 9.5, Code of Penal Discipline; and 9.8, Furloughs.

3. **Definitions.** For the purposes stated herein, the following definitions apply:

    A. **Classification.** The ongoing process of collecting and evaluating information about each inmate to determine the inmate's risk and need level for appropriate confinement location, treatment, programs, and employment assignment whether in a facility or the community.

    B. **Commitment.** The status of an inmate when legal custody is maintained by the Department of Correction. Custody may be in a correctional institution or the community.

    C. **Community Release Program.** A correctional program based in the community for eligible inmates, which includes transitional supervision and residential program placement.

    D. **Newly Admitted Inmate.** An accused, convicted or sentenced inmate who enters the Department of Correction under a new period of commitment. If an inmate has not left the custody of the Department prior to readmittance, the inmate shall not be treated as newly admitted. For the purposes of this directive, an inmate admitted as a temporary surrender shall not be considered a newly admitted inmate.

    E. **Override.** A documented condition of fact warranting an increase or decrease in the overall risk level of an inmate.

| DIRECTIVE NO. 9.2 | EFFECTIVE DATE March 5, 2003 | PAGE OF 3    12 |
|---|---|---|
| TITLE | | |
| | Inmate Classification | |

C.    <u>York Correctional Institution</u>.  Any sentenced and/or pretrial female inmate shall be admitted to York Correctional Institution. Risk and needs assessments shall be completed as required in Section 8.

D.    <u>Manson Youth Institution</u>.  Any male offenders age 14-20 sentenced to two (2) years or less shall be directly admitted to Manson Youth Institution.  Risk and needs assessments shall be completed as required in Section 8.

E.    <u>Juvenile Offenders</u>.  Manson Youth Institution shall house all male juvenile offenders, and York Correctional Institution shall house all female juvenile offenders.  No other facility shall knowingly accept a juvenile offender.  Any facility receiving an offender in this category shall immediately report the admission to the Population Management Unit.  The receiving facility shall also make an immediate psychiatric referral to ensure that qualified staff evaluate the offender as soon as possible.  In addition, the receiving facility shall place the juvenile in Administrative Detention and make an immediate request for priority transfer to Manson Youth Institution as appropriate. Prior to transfer, facility classification staff shall complete, at a minimum, an initial risk assessment.  Both Manson Youth Institution and York Correctional Institution shall develop Unit Directives that provide for the unique orientation, housing, and program needs of the juvenile offender.

8.    <u>Classification Assessment</u>.  Inmate classification assessments shall be based upon the individual risk and needs of the inmate.

A.    <u>Risk Assessment</u>.  An inmate's risk assessment shall represent the inmate's potential for violence, escape, or disruption of the orderly functioning of a facility or other place of confinement. The level of risk is determined by rating the following factors:

1.    history of escape;
2.    severity/violence of the current offense;
3.    history of violence;
4.    length of sentence;
5.    presence of pending charges, bond amount and/or detainers;
6.    discipline history; and
7.    Security Risk Group membership.

B.    <u>Inmate Needs Assessment</u>.  An inmate's needs shall be assessed in the following areas:

1.    medical and health care;
2.    mental health care;
3.    education;
4.    vocational training and work skills;
5.    substance abuse treatment;
6.    sex offender treatment; and
7.    family/residence or community resources.

| DIRECTIVE NO. | EFFECTIVE DATE | PAGE | OF |
|---|---|---|---|
| 9.2 | March 5, 2003 | 5 | 12 |

| TITLE |
|---|
| Inmate Classification |

designee.  **Any inmate assigned to Risk Level 5 shall be reviewed at a minimum, every six (6) months for a possible risk level reduction.**

2.   <u>Reductions from Risk Level 4 to 3 and Risk Level 3 to 2</u>. Reductions of Risk Level shall be considered after a sentenced inmate has completed a prescribed amount of time in confinement as noted below.  Any inmate serving a life sentence with no possibility of parole or release is not eligible for a risk level decrease without the review and approval of the Director of Offender Classification and Population Management.  The percentage of time served for determinate sentences shall be computed on the estimated release date for offenses committed prior to October 1, 1994, and on the maximum release date for offenses committed on or after October 1, 1994.  The percentage of time served for indeterminate sentences shall be computed based on the projected discharge date.  Parole status shall only be considered when a firm Voted to Parole (VTP) Date has been granted by the Parole Board, at which time the VTP Date may be considered the release date for percentage of time calculations.  Any inmate serving a sentence for a sex related offense or having a history of sex related offenses shall be approved by the Commissioner or designee prior to being classified below Risk Level 3.  If not approved, the reason for a denial of a routine level reduction shall be documented on the Inmate Classification Form (ICF).  The schedule for risk level reductions and eligibility criteria for these reductions shall be as follows:

| | <u>Percentage of Time Served Since Last Risk Score Change</u> | <u>No Class A Disciplinary Past 120 Days or Class B Past 90</u> |
|---|---|---|
| <u>Level</u>    4 to 3 | 35% | X |
| 3 to 2 | 30% | X |

Once an inmate meets the eligibility criteria above, a risk level reduction review shall be completed.

3.   <u>Reduction to Risk Level 1</u>.  Reduction to Risk Level 1 shall be in accordance with Section 11.

4.   <u>Reduction Based on New Information</u>.  Receipt of new information regarding the inmate may also require a classification review and a risk level reduction.  A reduction may be prompted for one of the following reasons:

a.   a reduction of charges against the inmate;
b.   a removal of a detainer;
c.   sentence modification and reduction of sentence;
d.   reduction in bond; and/or
e.   successful Security Risk Group Renunciation.

5.   <u>Reduction Exclusion Based on Assignment Refusal</u>. A sentenced inmate who refuses to participate in an available educational or programmatic assignment, consistent

| DIRECTIVE NO. 9.2 | EFFECTIVE DATE March 5, 2003 | PAGE OF 7 | 12 |
|---|---|---|---|
| TITLE | Inmate Classification | | |

g.  remain discipline free of a Class B offense during the preceding 60 days;

h.  no escape conviction within the past calendar year;

i.  have no pending charges or detainers unless bond has been posted, except pending out of state charges below Risk Level 4 with official verification that the state will not extradite; and

j.  have an approved sponsor and/or have secured housing at an acceptable residence approved by a Community Enforcement.

2.  **Eligibility Date and Notification**. Within two (2) weeks of sentencing, unit classification staff shall determine the date that an eligible inmate may be placed on Transitional Supervision. When an inmate is not recommended for placement on Transitional Supervision, the Transitional Supervision package shall be forwarded to the Community Enforcement Unit for review. The Director of Offender Classification and Population Management shall also review the decision and affirm or establish a placement date. If a placement date is established, the Director of Offender Classification and Population Management shall notify the Unit Administrator of the facility housing the inmate and the Community Enforcement Unit. The Unit Administrator shall then inform the inmate of the placement date.

3.  **Risk Level**. Upon approval for Transitional Supervision an inmate shall be classified to Overall Risk Level 1.

B.  **Residential Program Placement**.

1.  **Eligibility Criteria**. An inmate may be eligible for residential program placement when the following criteria are met:

a.  be classified Level 2;

b.  be within 18 months of estimated discharge date or Voted to Parole date;

c.  remain discipline free of a Class A offense during the preceding 120 days;

d.  remain discipline free of a Class B offense during the preceding 60 days;

e.  no escape conviction within the past calendar year;

f.  remain free of community release program failure during the preceding six (6) months; and

g.  have no pending charges or detainers unless bond has been posted except pending out of state charges below Risk Level 4 with official verification that the state will not extradite.

2.  **Risk Level**. Upon approval for residential program placement an inmate shall be classified to Overall Risk Level 1.

| DIRECTIVE NO. 9.2 | EFFECTIVE DATE March 5, 2003 | PAGE OF 8    12 |
|---|---|---|
| TITLE | Inmate Classification | |

12. <u>Risk Level Increases</u>. Risk Level increases shall occur as required upon receipt of new information pertinent to the inmate's risk classification or inmate's disciplinary adjustment.

A. <u>Disciplinary Increases</u>. Poor disciplinary adjustment may result in an inmate's Overall Risk Factor being increased and a corresponding increase of the Discipline History Factor to the level of the Overall according to the schedule detailed in the Classification Manual.

An inmate who is found guilty of a Level 2 assault on a Department of Correction employee as defined in Administrative Directive 6.6, Reporting of Incidents, shall be classified to Overall Risk Level 4 with a corresponding increase in the Discipline Risk Factor.

In the event of multiple disciplinary charges arising from a single disciplinary incident, only the highest chargeable class of offense shall be used.

An inmate assigned to Close Custody for Chronic Discipline shall automatically be classified to Overall and Discipline Risk Factor 4.

Reviews resulting in an Overall Risk Level increase which will require a transfer to another facility shall require the approval of the Director of Offender Classification and Population Management.

B. <u>Conviction of a Felony</u>. Conviction of a felony committed while incarcerated shall result in a level increase review.

C. <u>Assignment to Overall Risk Level 5/Administrative Segregation</u>. Assignment to Overall Risk Level 5/Administrative Segregation shall be considered when any totality of facts, information or circumstances which indicates an immediate threat to safety and/or security of the public, staff or other inmates. An inmate shall be automatically placed in Administrative Detention and be reviewed for placement in Administrative Segregation/Overall Risk Level 5, under any of the following conditions:

1. Level 1 assault on a Department of Correction employee as defined in Administrative Directive 6.6, Reporting of Incidents;
2. Hostage holding of a Department of Correction Employee;
3. Riot;
4. Homicide while confined;
5. An inmate is sentenced to death;
6. Escape from the security perimeter of a facility;
7. Continues to present a threat to safety, security and/or orderly operation after one (1) year in Close Custody for Security Risk Groups;
8. Continues to present a threat to safety security and/or orderly operation after six (6) months in Close Custody for Chronic Discipline; and

| DIRECTIVE NO. | EFFECTIVE DATE | PAGE | OF |
|---|---|---|---|
| 9.2 | March 5, 2003 | 6 | 12 |

| TITLE |
|---|
| Inmate Classification |

with assessed needs in accordance with Section 8(B) of this Directive, may be precluded from a classification reduction until the inmate complies with a mandatory classification program assignment as identified in the Program Index Compendium.

6. **Disciplinary History Factor Reduction**. During an initial assessment, an inmate's discipline history factor shall be reviewed to determine whether or not any change is warranted. If the inmate has not been found guilty of a Class A or B disciplinary violation in accordance with Administrative Directive 9.5, Code of Penal Discipline for one (1) year, (six (6) months for inmates under 16 years of age), a reduction of one (1) level may be made to this factor.

11. **Community Release Programs**. The community release program shall provide an eligible inmate with the opportunity to reintegrate into the community. Any inmate who refuses to participate in an available educational or program assignment, consistent with the inmate's assessed needs in accordance with Section 8(B) of this Directive, may be excluded from community release consideration until the inmate complies with the classification assignment. A member of a Security Risk Group in accordance with Administrative Directive 6.14, Security Risk Groups, shall be excluded from Community Release consideration. Program placement may include Transitional Supervision or residential program placement as follows:

A. **Transitional Supervision**.

1. **Eligibility Criteria**. An inmate incarcerated by the Department of Correction for a definite total effective sentence of two (2) years or less shall, subject to the following criteria, be eligible for consideration for Transitional Supervision. The two (2) years maximum sentence shall include any unpaid fine calculated consecutively at $50 per day. In addition, the following criteria must be met:

   a. classified below Level 5;
   b. served at least 50 percent of the sentence imposed less jail credit;
   c. must not be serving the mandatory portion of Driving While Intoxicated, 14-227(a) or a Driving Under Suspension offense that originally was related to a Driving While Intoxicated, 14-215(c) sentence;
   d. have no sex offender need score greater than one (1);
   e. favorable recommendations for inmates with mental health need scores greater than three (3) shall be forwarded to the Director of Health, Mental Health and Addiction Services for review to further ensure continuity of care;
   f. remain discipline free of a Class A offense during the preceding 120 days;

| DIRECTIVE NO. 9.2 | EFFECTIVE DATE March 5, 2003 | PAGE 4 | OF 12 |
|---|---|---|---|
| TITLE | Inmate Classification | | |

Assessment of inmate needs shall be accomplished by classification staff in conjunction with staff responsible for the evaluation and provision of services for the need area.

C.    Overall Risk Score. An overall classification assessment score shall be determined for each inmate. An overall risk score is determined by the highest rating assigned to any of the seven (7) factors outlined in section 8 (A), with the exception of the sex offender treatment need score in Section 8 (B). No inmate with a sex offender treatment need score of two (2) or greater shall be assigned an overall score below level three (3) without authorization from the Commissioner or designee. The overall score shall be assigned taking into account the inmate's risk assessments and behavior during confinement.

D.    Overrides. An overall risk score may be increased or decreased through an override. An override of the inmate's overall risk score shall be documented in writing and approved by the Unit Administrator in consultation with the Director of Offender Classification and Population Management or designee. An override shall not be used to decrease an inmate's Risk Level Score more than once during any term of continuous sentenced incarceration. No inmate shall be overridden to Level 1.

9.    Initial Classification Review. A preliminary classification risk assessment shall begin within the first two (2) business days of commitment. A preliminary risk classification shall be determined prior to transfer to a Level 3 or higher risk level confinement. Full initial classification shall be completed prior to any transfer to any Level 2 facility. Within 14 days of commitment to the Department, the initial overall risk score shall be assigned. Within 30 days, the needs assessment and full initial classification shall be completed.

10.    Reclassification Review. After initial classification, the inmate's risk level and needs shall be regularly reviewed or immediately following any change in an inmate's status that may affect the risk score as follows:

A.    Regular Reclassification. An inmate's risk and needs shall be reviewed every six (6) months after the initial classification has been established with the exception of the following: annually for Level 4 and Level 3 general population inmates with greater than five (5) years remaining on their sentence.

B.    Risk Level Reductions. A reduction of the inmate's risk level shall be reviewed as follows:

1.    Reductions from Overall Risk Level 5. All inmates assigned to Overall Risk Level 5 will be assigned to Administrative Segregation. Inmates approved for removal from Administrative Segregation as per Administrative Directive 9.4, Restrictive Status, shall be reduced to the appropriate Overall Risk Level 4 status. Any inmate assigned to Administrative Segregation shall not have the risk level reduced without the approval of the Commissioner or

| DIRECTIVE NO. | EFFECTIVE DATE | PAGE OF |
|---|---|---|
| 9.2 | March 5, 2003 | 2    12 |

| TITLE |
|---|
| Inmate Classification |

4.   **Classification Goals.**  The goals of the Department's classification system are to:

    A.   Ensure the safety and well being of the community, facility, staff and the inmate.

    B.   Apply a consistent and reliable classification and assessment system that assigns inmates a level of confinement consistent with the protection of the community, staff, and inmates.

    C.   Recommend inmate programs and activities according to specific needs.

    D.   Involve the staff and the inmate in developing an incarceration plan and a plan for community release and reintegration, where appropriate.

    E.   Develop, record and analyze data necessary for individual decision making and program and facility planning.

    F.   Ensure that staff and inmates understand the procedures and criteria used in the classification process.

5.   **Classification Management.**  The Director of Offender Classification and Population Management shall be responsible for the Department of Correction's classification system.  The Director of Offender Classification and Population Management shall develop a classification manual containing detailed information concerning inmate classification procedures which shall be reviewed annually and updated as necessary. The Unit Administrator shall be responsible for administering the classification procedures under this Directive.  However, nothing in this Directive shall preclude the Director of Offender Classification and Population Management, a Deputy Commissioner or the Commissioner from intervening in any classification decision at any time.  The Director of Offender Classification and Population Management shall be responsible for an annual audit to determine compliance with the Department's classification directives and manual.

6.   **Classification Levels.**  Each inmate shall be classified according to risk and needs, and shall be assigned an overall risk score of one (1) to five (5).  A risk score Level 1 shall represent the lowest security level and 5 the highest.  A needs score Level 1 shall represent the lowest need level and 5 the highest.

7.   **Admissions and Assessment.**

    A.   **MacDougall-Walker Correctional Institution.**  Any male inmate sentenced to greater than two (2) years shall normally be admitted to MacDougall-Walker Correctional Institution.  Risk and comprehensive needs assessment shall be completed over a period of 10 business days.  Upon completion of the classification assessment, the inmate shall be transferred to an appropriate facility.

    B.   **Direct Admission Facilities.**  Any male inmate in pretrial status or sentenced to two (2) years or less shall be admitted to the direct admission facility serving the court of jurisdiction: Hartford, Bridgeport or New Haven Community Correctional Centers or Corrigan-Radgowski Correctional Institution. Risk and needs assessments shall be completed in accordance with Section 8.



# Administrative Directives Revision Form
## Connecticut Department of Correction
### Page    2    of    2

CN 1305
Addendum
REV 1/27/03

| Number    9.2 | Title    Inmate Classification |
| --- | --- |

**Summary of revisions:**

Section 13 was re-worded for clarification

Section 13(D) was added

Section 15 first sentence was deleted

Section 17 was deleted

Section 19 (A)(1)-(4) were modified to coincide with classification manual
Section 19 last paragraph was changed to clarify the review of an inmate after parole denial

Section 20 was deleted, to be added in Chapter 4