UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROBERT REID                              :        CIVIL ACTION NO. 3:03CV208(JCH)
    *PLAINTIFF*                          :

V.                                       :

JOHN ARMSTRONG, ET AL.,                  :
    *DEFENDANTS*                        :        JUNE 18, 2004


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


    The defendants, John Armstrong, George Wezner, Joanne Borden and Gary Credit, submit this memorandum in support of their motion for summary judgment and in opposition to the plaintiff's March 31, 2004 motion for summary judgment.  As shown below, the plaintiff's claims are without merit, there are no disputed issues of material fact, and the defendants are entitled to judgment as a matter of law.

    **I.  FACTUAL BACKGROUND**

    The plaintiff, Robert Reid, is a sentenced inmate from New Hampshire serving time in a Connecticut correctional institution.  Currently, Mr. Reid is serving an indeterminate sentence of ten to thirty year sentence imposed by a New Hampshire court for Second Degree Assault, and pursuant to an agreement between the States of Connecticut and New Hampshire, the plaintiff is serving his sentence in Connecticut.  See New Hampshire Mittimus, Ex. 1; Affidavit of Major Lynn Milling, Ex. 2 at ¶¶ 2, 3, 5.  The defendants, all employees of the Connecticut Department

of Correction (hereinafter "DOC") are: John Armstrong, the former DOC Commissioner; George Wezner, a former DOC Warden, and Joanne Borden and Gary Credit, both of whom are correctional counselors employed by DOC. See Complaint at paras. 2-5.

The plaintiff has an exceptionally violent history of behavior, both as a criminal while free in New Hampshire and while incarcerated there and in Connecticut. His current ten to thirty year sentence is his punishment for assaulting a New Hampshire State Police Trooper, who had stopped a vehicle in which the plaintiff was only a passenger. During the course of the stop and an attempt to administer a field sobriety test to the driver of the vehicle, the plaintiff attacked and repeatedly assaulted the officer, wrestling with him in the travel portion of a highway, repeatedly punching the trooper in the head and biting his thumb. His sentence was enhanced pursuant to New Hampshire state law given his history of felony convictions, including a sexual assault conviction. See *State v. Reid*, 134 N.H. 418, 419-21, 594 A.2d 160 (N.H. 1991); Affidavit of Lynn Milling, Ex. 2 at ¶ 13.

The plaintiff continued his assaultive behavior while incarcerated in New Hampshire, having amassed a significant disciplinary history in his home state. For nearly three years prior to coming to Connecticut, the plaintiff was classified as a C-5 (maximum) inmate, the highest security classification in New Hampshire, and was assigned to a "special housing unit" as that term was used by New Hampshire correctional officials, resulting from the plaintiff's assault on a correctional officer where he stabbed the officer near the eye with a fork. See Disciplinary Records appended hereto as Ex. 3.

After his placement in the special housing unit in New Hampshire, the plaintiff again received discipline after he grabbed a correctional officer's keys and used the keys to unlock his handcuffs. On another occasion, the plaintiff assaulted several correctional officers as they attempted to remove his handcuffs, kicking and attempting to bite the officers. In addition, the plaintiff's New Hampshire disciplinary history includes punishment for: threatening persons with bodily harm; having drugs in his urine; possession of escape implements; possession of a weapon; disruptive conduct; fighting; and causing bodily injury. See Disciplinary Records appended hereto as Ex. 3.

On or about December 18, 1997, a representative of the New Hampshire interstate compact office wrote to Lynn Milling, a DOC Major who supervises Connecticut's interstate compact agreements, requesting that Connecticut accept the plaintiff as a transferee under the Compact. A Corrections Compact Referral Summary prepared as part of the transfer request indicates that plaintiff "needs a fresh start" and is having "difficulty adjusting to current incarceration." See New Hampshire Referral Summary, Ex. 4.

Upon his arrival in Connecticut on February 23, 1998, the plaintiff was assigned to the Walker Reception and Special Management Unit for intake purposes, and three days later, sent to Northern CI, placed on administrative detention status pending an administrative segregation hearing. See DOC RT60 Record of Inmate Movements, Ex. 5. Connecticut DOC maintains several different restrictive housing alternatives for its inmate population. The most restrictive, administrative segregation, is designed to safely manage inmates who are classified as threats to staff, other inmates or facility security. In order for an inmate to be placed in administrative seg-

regation, a hearing must be held to give the inmate an opportunity to rebut the reasons for his placement, and approval for placement on this status must come from the Director of Offender Classification and Population Management, or a higher authority within DOC. Inmates assigned to administrative segregation can remain on that status indefinitely until their behavior changes to a degree that placement in a general inmate population becomes appropriate. Inmates on administrative segregation are reviewed for reclassification every seven days for the first two months and every thirty days thereafter, and may be released from this status only by approval of the Commissioner of the DOC or his designee. The plaintiff remained on administrative segregation during much of the time he spent at Northern. See DOC Restrictive Housing Status Chart, Ex. 6.

Over time, the plaintiff progressed through the various phases of the administrative segregation program, and was transferred from administrative segregation to the general population at MacDougall Correctional Institution on October 5, 2000. From March 23, 2001 until the present, except for periods when he returned to New Hampshire to attend to legal matters in his home state, Mr. Reid has been housed at several Level 4, maximum security facilities in Connecticut. See RT60, Ex. 5. The inmate housing records for Mr. Reid show frequent returns to his home state to attend to legal matters. See RT60 Record of Inmate Movements, Id. Although he has progressed out of the administrative segregation program, Mr. Reid has continued to engage in violent, disruptive behaviors. On February 14, 2000, Mr. Reid assaulted his cellmate at Northern, resulting in administrative sanctions. See Incident Report and Disciplinary Report, Ex. 7. His most recent assault occurred just this month, when he repeatedly assaulted a fellow in-

mate, punching the inmate with closed fists in the head and face. See RT 67 Inmate Disciplinary Report, Ex. 8; Incident Report and Disciplinary Report, Ex. 9.

In addition to the challenges posed to correctional officials by his violently assaultive history, Mr. Reid has a history of a sexual offense. Mr. Reid is classified as having a sexual risk score of 3, which means that he may only be placed in a halfway house with the consent of the DOC Commissioner. Currently, it is the practice of the DOC not to allow individuals with a sexual risk score of 3 or above to be placed in the community. See affidavit of Lynn Milling, Ex. 2 at ¶ 13. With a current maximum release date in 2019, no firm parole date from the New Hampshire Board of Parole and a significant history of assaultive behavior, Mr. Reid is considered by Connecticut DOC officials to be a maximum security inmate, and therefore is held in maximum security facilities. Milling Affidavit, ¶ 10.

Although the plaintiff is a sentenced inmate from the State of New Hampshire, the plaintiff is subject to the inmate classification, discipline and general custody rules of the Connecticut Department of Correction. The Contract for the Implementation of The Interstate Corrections Compact between the states of Connecticut and New Hampshire expressly provides that

> It shall be the responsibility of the administration of the institution in the receiving state to confine inmates from a sending state; to give them care and treatment, including the furnishing of subsistence and all necessary medical and hospital supplies; to provide for their physical needs; to make available to them programs of training and treatment which are consistent with their individual needs; to retain them in safe custody; to supervise them; to maintain proper discipline and control; to make certain that they receive no special privileges and that the sentences and orders of the committing court in the sending state are faithfully executed. But nothing herein shall be construed to require the receiving state or any of its institutions to provide treatment, facilities or programs for any inmate confined pursuant to the Interstate Corrections compact which it does not provide for similar inmates not confined pursuant to said Compact.

The Contract further provides that all inmates "while in the custody of the receiving state shall be subject to all the provisions of law and regulations applicable to persons committed for violations of law of the receiving state not inconsistent with the sentence imposed." Interstate Compact—Implementation Contract, Ex. 10 at pp. 2, 4. The Connecticut DOC inmate classification guidelines prohibit incarceration of individuals with the plaintiff's history and present duration of sentence in a less secure environment. See Affidavit of Major Lynn Milling, Ex. 2 at ¶ 12. With respect to inmates transferred from New Hampshire to other jurisdictions, the New Hampshire DOC's inmate classification procedures defer authority to make such classifications to the receiving state. See Relevant Portions of New Hampshire Classification Manual, Ex. 11 at p. 2.

Despite a horrendous criminal and institutional history, the plaintiff seeks, in essence, an order from this court that would facilitate his release on parole in New Hampshire. Contrary to plaintiff's assumptions regarding parole, it is clear that, under New Hampshire law, the plaintiff has no right to parole. It is undisputed that the plaintiff has been denied parole on one occasion, and that he has been informed by the New Hampshire Adult Parole Board that he will not be considered for parole until he obtains a halfway house placement and completes anger management classes. See Parole Board Decision, Ex. 12. Mr. Reid also has been advised that a reduced custody level is viewed by New Hampshire authorities as a "privilege." See 3/6/03 Letter From Denise Heath to Plaintiff, Ex. 13. In addition to applicable case law, cited below, and the communications from the New Hampshire Parole Board to the plaintiff, it is undisputed, as a matter

of fact, that the plaintiff is not entitled to parole in New Hampshire. See Affidavit of John F. Eckert, Ex. 14 at ¶ 4. Moreover, under New Hampshire law, the decision to release any convict on parole is a purely discretionary matter, with that discretion resting solely with the New Hampshire Adult Parole Board. See Id. at ¶¶ 2, 3; New Hampshire Code of Administrative Rules for Adult Parole Board, Part 301, appended hereto as Ex. 15. Thus, the plaintiff has nothing more than a unilateral expectation of parole release.

Ignoring his own violent and harmful acts both in and outside of prison, and asking this court to do the same, Mr. Reid brings this action, seeking money damages and an order compelling the Connecticut DOC to place him in a halfway house to facilitate his eligibility for parole in New Hampshire, and to award money damages. Such an order is wholly unsupported by fact and law. For the several reasons that follow, the defendants are entitled to summary judgment, and the plaintiff's motion for summary judgment should be denied.

## II. ARGUMENT

### A. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. §56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). *See also, Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). A party may

not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986) *cert denied* 480 U.S. 932, 107 S.Ct. 1570 (1987).  The party opposing a motion for summary judgment "may not rest upon the mere allegation or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. §56(e).

In discussing the history and propriety of summary judgment motions, the Supreme Court has explained:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action."  Fed. Rule Civ. Proc. 1 ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

A party is not permitted to create his own "genuine" issue of fact simply by presenting contradictory or unsupported statements. *See Securities and Exchange Commission v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir. 1978).  Thus, "[w]here the record could not lead a rational trier of facts to find for the nonmoving party, there is then no 'genuine issue for trial.'" *Clements v. County of Nassau*, 835 F.2d 1000, 1004 (2d Cir. 1987).  The record in this case, even when considered in a light most favorable to the plaintiff, fully supports the granting of summary judgment in favor of the defendants.

### B. The Defendants' Motion For Summary Judgment Should Be Granted Because The Plaintiff Has Failed To Demonstrate The Personal Involvement Of Defendants Armstrong, Wezner, Borden and Credit.

As an initial matter, the defendants note that there is no evidence that the named defendants were personally involved in any of the actions resulting in the plaintiff's classification as a maximum security inmate. The undisputed material facts clearly establish that the decision to place the plaintiff in these restrictive housing programs was made by persons within the DOC responsible for inmate classification, not these defendants. Accordingly, these defendants are entitled to summary judgment.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) *cert. denied* 434 U.S. 1087 (1978). "A plaintiff must thus allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "Mere allegations that defendants knew of the wrongs does not establish personal involvement." *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 355 (S.D.N.Y. 2000) *citing De Jesus v. Sears, Roebuck and Co.*, 87 F.3d 65, 70 (2d Cir. 1996).

"It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Cox v. Colgane*, 1998 U.S. Dist. LEXIS 3934 (S.D.N.Y. 1998) (attached) *citing Higgins v. Artuz*, 1997 U.S. Dist. LEXIS 12034, No. 94 Civ. 4810, 1997 WL 466505, at *1, *7 (S.D.N.Y. Aug. 14, 1997) (*citing Greenwaldt v. Coughlin*, 1995 U.S. Dist. LEXIS 5144, No. 93 Civ. 6551, 1995 WL 232736 at *3 (S.D.N.Y. Apr. 19, 1995)). *See also*

*Garrido v. Coughlin*, 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation).

Moreover, "the Second Circuit has held that complaints with vague and conclusory allegations of a conspiracy to deprive a person of constitutional rights simply cannot withstand a motion for summary judgment." *Katz v. Morgenthau*, 709 F. Supp. 1219, 1235 (S.D.N.Y.) *aff'd in part reversed in part*, 892 F.2d 20 (2d Cir. 1989); see also *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *Herrera v. Scully*, 815 F. Supp. 713, (S.D.N.Y. 1993).

Here, it is clear that persons responsible for classification of inmates sent to Connecticut from other states made the decision to classify Mr. Reid as a maximum security inmate, first at Northern CI, and later at other maximum security facilities throughout the system. *See* Affidavit of Major Lynn Milling Ex. 2 at ¶¶ 4, 7. While subsequent classification decisions were made at the facility levels, such decisions fully comported with DOC directives governing the objective classification of inmates, not the exercise of discretion by any of the defendants.. See Id.

### C. The Plaintiff Has No Right To A Particular Inmate Classification

In his complaint, the plaintiff essentially asserts that, if he were incarcerated in New Hampshire, he would be entitled to parole because he would be housed in a lesser security facility or halfway house, and therefore the defendants are effectively depriving him of his rights to a particular inmate classification. As shown below, this claim is without merit.

10

In order to state a claim for relief under 42 U.S.C. § 1983, the plaintiff must allege facts which indicate that the defendants have acted under color of state law to deprive him of a constitutionally or federally protected right. *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 930 (1982); *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986).

The United Stated Supreme Court has established a "minimum intrusion" policy into the decisions of State prison administrators that provides these officials with wide discretion in the operation of prison facilities. *Procunier v. Martinez*, 416 U.S. 396 (1974). In Connecticut, the Commissioner of Correction has broad discretion to establish procedures and standards for the classification of inmates committed to his custody. Conn. Gen. State § 18-81; *Wheway v. Warden*, 215 Conn. 418, 431-432, 576 A.2d 494 (1990); *see also, Abed v. Commissioner of Correction*, 43 Conn. App. 176, *cert. denied*, 239 Conn. 937 (1996) (holding that state statutes do not create any right to earn statutory good time and the Commissioner has discretion not to allow inmates classified as safety threats to earn good time).

It is well settled that an inmate has no right to a particular security classification even if that classification is less desirable or is more restrictive. *Moody v. Daggett*, 429 U.S. 78, 88-89 n. 9 (1976); *Pugliese v. Nelson*, 617 F.2d 916, 925 (2d Cir. 1976). In *Pugliese*, the Second Circuit recognized that there is no constitutionally protectable entitlement to a particular prison classification, stating that "the fact that the interests of a prisoner are adversely affected and that a grievous loss is suffered does not warrant constitutional protection." *Pugliese*, 617 F.2d at 925.

It may very well be true that the plaintiff has been unable to satisfy the desire of the New Hampshire parole board to earn placement in a halfway house before earning parole, and that the

plaintiff's failure to do so results, at first glance, from the objective classification policies of the Connecticut Department of Correction. Of course, the plaintiff's conclusion in this regard is a gross oversimplification of the underlying facts of this case, and most notably, ignores the plaintiff's own behavior which resulted in his move to Connecticut and the cumulative effect of violent incident upon violent incident which has resulted in a well-deserved, maximum security classification.

In this case, the facts in *Pugliese* are instructive. At issue in *Pugliese* were certain classification guidelines created by the United States Bureau of Prisons for managing high-risk inmates. The consequences of obtaining such a classification were substantial, and indeed, often resulted in delays and/or preclusion of an inmate from obtaining institutional transfers, furloughs or participation in community programs, such as work release. See *Id.*, 617 F.2d at 919. In upholding such restrictive classification policies, the Second Circuit reasoned ""where prison authorities have unfettered discretion to transfer prisoners from one institution to another, a prisoner's interest in avoiding transfer to an institution affording less favorable living conditions is insufficient to qualify for due process protection." *Id.*, 617 F.2d at 922.

Like the classification policies at issue in *Pugliese*, the actions of DOC employees challenged by the plaintiff herein certainly impact upon the plaintiff's ability to obtain parole. According to a notice from the New Hampshire Board of Parole, the plaintiff will not be considered for parole release until he is placed in a halfway house and completes anger management classes. See Parole Board Decision, Ex. 12. Plaintiff has no right to such a classification, and his intuitional behavior and the length of time left on his sentence certainly warrant incarceration in a

maximum security facility.  Moreover, *Procunier, Moody* and *Pugliese* require deference to DOC officials in this regard.

Likewise, the plaintiff has no right to a particular classification or even to be housed in his own state.  The Supreme Court has recognized that, just as an intrastate transfer of an inmate from one facility to another does not implicate due process protections, "it is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced, or to be transferred to an out-of-state prison after serving a portion of his sentence in his home State."  *Olim v. Wakinekona*, 461 U.S. 238, 247 (1983).  Extending the line of cases beginning with *Meachum v. Fano*, 427 U.S. 215 (1976), the Court in *Olim* recognized that, just as prison officials must be free to transfer inmates within their own facilities, so too it is important to allow officials to move inmates from state to state for a number of reasons, including the need to access federal correctional facilities, manage prison overcrowding and separate particular prisoners from others.  *Olim*, 461 U.S. at 245-6.  Mindful that "his conviction, not the transfer, deprived him of his right to freely inhabit the State,"  the court in *Olim* held that a conviction in any one state "empowers the State to confine the inmate in any penal institution in any State unless there is state law to the contrary or the reason for confining the inmate in a particular institution is itself impermissible."  *Id.*, 461 U.S. at 248.  Here, plaintiff can point to no state law prohibiting his incarceration in Connecticut.  Indeed, the Interstate Corrections Compact provides just the opposite, as reflected in the implementation agreement executed by New Hampshire and Connecticut.  See Ex. 10.

In sum, the defendants are well within their discretion to classify the plaintiff in their chosen manner, and the consequences that result from the plaintiff's classification as a maximum security inmate do not give rise to a cause of action. Of course, placing blame on the Connecticut DOC's classification policies and the decisions of those employees who enforce these policies for the plaintiff's current predicament is akin to the plaintiff faulting New Hampshire police and that state's penal code for his arrest and conviction for assaulting a police officer. It is this hypocricy, and the recognized discretion of state correctional officials, that should prove fatal to plaintiff's claims.

### D. Plaintiff Fails To Adduce Any Facts Suggesting That a Liberty Interest Was Adversely Affected By Defendants' Actions And Thus Fails To State A Due Process Claim

Even assuming that one may agree with the plaintiff that the Connecticut DOC classification policies, and not the plaintiff's own behavior, are the reason for his failure to obtain parole in New Hampshire, this claim is not cognizable under § 1983 because the plaintiff has only a unilateral, unenforceable expectancy in parole release. His own personal expectancy, as characterized in *Pugliese*, is "too ephemeral, contingent or speculative" to rise to the level of a liberty interest which in turn would trigger due process protections.

To articulate a claim under 42 U.S.C. § 1983 alleging the violation of a liberty interest without procedural due process, an inmate must first establish that he enjoyed a protected liberty interest. *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 104 L. Ed. 2d 506, 109 S. Ct. 1904 (1989). Inmates' liberty interests are typically derived from two sources, the Fourteenth Amendment Due Process Clause and state statutes or regulations. Id; *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998).

Interests arising directly under the due process clause are narrow in scope, protecting no more than "'the most basic liberty interests in prisoners.'" *Id*. The due process clause standing alone "does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." *Sandin*, 515 U.S. at 478. Rather, the due process clause protects against restraints or conditions of confinement that "exceed[] the sentence in . . . an unexpected manner." *Id*. at 484.

With regard to state-created liberty interests, the Supreme Court in *Sandin* refocused the inquiry from whether a mandatory directive in a state statute or regulation created a liberty interest to the "nature of the deprivation" itself. *See Sandin*, 515 U.S. at 481-484.

> [I]n *Sandin*, the Supreme Court explicitly held that disciplinary confinement does not deprive an inmate of a liberty interest unless the confinement imposes an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison life.

*Miller v. Selsky*, 111 F.3d 7, 8 (2d Cir. 1997). The burden is on the inmate to allege facts showing that the conditions of his ongoing confinement were "dramatically different from the 'basic conditions of his indeterminate sentence.'" *Id*. at 9. "The plaintiff can prevail only if the evidence of record is legally sufficient to support his claim." *Sealey v. Giltner*, 197 F.3d 578 (2d Cir. 1999). Critically, in *Sandin*, the Supreme Court rejected the inmate's claim that "any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation." *Id.,* 515 U.S. 472, 115 S.Ct. at 2300.

The Second Circuit Court of Appeals requires that a plaintiff bringing a claim under *Sandin* demonstrate that "the confinement or restraint creates an 'atypical and significant hard-

ship' under *Sandin*, and that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).   "[A]dministrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point. . . "  *Russell v. Scully*, 15 F.3d 219, 221 (2d Cir. 1993).

In applying *Sandin*, several factors are to be used in determining whether the particular restrictions are atypical and significant, including: (1) the effect of the segregation on the length of the plaintiff's prison confinement; (2) the extent to which conditions at issue differ from other prison conditions; and (3) the duration of the inmate's disciplinary confinement compared to the potential duration a prisoner may experience while in discretionary confinement. *See Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998).  Here, the plaintiff relies entirely upon the first prong, namely, that his classification as a maximum security inmate in Connecticut has somehow lengthened his sentence by depriving him of a New Hampshire parole.  This, of course, is untrue.

Under New Hampshire law, it is clear that the plaintiff has no expectation of release at any given time or upon satisfaction of any set of prerequisites.  To the contrary, there is no right to the grant of parole in New Hampshire "[i]n the absence of some provision grounded in State law mandating a prisoner's release upon proof of Certain ascertainable facts." *Baker v. Cunningham*, 128 N.H. 374, 380 (1986); *Knowles v. Warden*, 140 N.H. 387 (1995).  Under New Hampshire law, it is clear that the plaintiff has no "right" to parole, and therefore no liberty interest entitled to due process protection.  Thus, the plaintiff's "mere hope for the possibility of freedom on parole, unsupported by some basis for his claiming entitlement to it, is insufficient,

since it depends wholly on the unfettered exercise of discretion by a board or other authority." Pugliese, 617 F.2d at 922; *Greeholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979).

Clearly, the plaintiff has no entitlement to parole in New Hampshire. Rather, the New Hampshire Adult Parole Board has informed the plaintiff that it would be willing to rehear his application for parole once he obtains placement in a halfway house and completes an anger management program. That may suggest to the plaintiff that, in the future, he may be able to apply for parole again, but it gives rise to nothing more than a unilateral expectancy of parole release. That is insufficient to give rise to a liberty interest entitled to due process protections.

### III. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment should be granted and the plaintiff's motion for summary judgment should be denied.

DEFENDANTS:

JOHN ARMSTRONG, ET Al.,

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: ___/s/_____
Terrence M. O'Neill
Assistant Attorney General
Federal Bar No. ct10835
110 Sherman Street
Hartford, CT 06105
Tel.: (860) 808-5450
Email: terrence.oneill@po.state.ct.us

### CERTIFICATION

I hereby certify that a copy hereof was mailed this date, first class postage prepaid, to:

Robert Reid, No. 262849
Garner CI
P.O. Box 5500
Newtown, CT 06470

_____/s/_____
Terrence M. O'Neill