UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT REID | : | CIVIL ACTION NO. 3:03CV208(WWE) |
| *PLAINTIFF* | : | |
| V. | : | |
| JOHN ARMSTRONG, ET AL., | : | |
| *DEFENDANTS* | : | NOVEMBER 19, 2007 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I. FACTUAL BACKGROUND**

The plaintiff, Robert Reid, is a sentenced inmate from New Hampshire who for a time served a portion of his sentence in certain Connecticut correctional institutions. Currently, Mr. Reid is serving an indeterminate sentence of ten to thirty year sentence imposed by a New Hampshire court for Second Degree Assault, and pursuant to an agreement between the States of Connecticut and New Hampshire, the plaintiff served a considerable portion of his sentence in Connecticut. See New Hampshire Mittimus, Ex. 1; Affidavit of Major Lynn Milling, Ex. 2 at ¶¶ 2, 3, 5. The defendants, all employees of the Connecticut Department of Correction (hereinafter "DOC") are: John Armstrong, the former DOC Commissioner; George Wezner, a former DOC Warden, and Joanne Borden and Gary Credit, both of whom are correctional counselors employed by DOC. See Complaint at paras. 2-5.

The plaintiff has an exceptionally violent history of behavior, both as a criminal while free in New Hampshire and while incarcerated there and in Connecticut. His current ten to thirty

year sentence is his punishment for assaulting a New Hampshire State Police Trooper, who had stopped a vehicle in which the plaintiff was only a passenger. During the course of the stop and an attempt to administer a field sobriety test to the driver of the vehicle, the plaintiff attacked and repeatedly assaulted the officer, wrestling with him in the travel portion of a highway, repeatedly punching the trooper in the head and biting his thumb. His sentence was enhanced pursuant to New Hampshire state law given his history of felony convictions, including a sexual assault conviction. See *State v. Reid*, 134 N.H. 418, 419-21, 594 A.2d 160 (N.H. 1991); Affidavit of Lynn Milling, Ex. 2 at ¶ 13.

The plaintiff continued his assaultive behavior while incarcerated in New Hampshire, having amassed a significant disciplinary history in his home state. For nearly three years prior to coming to Connecticut, the plaintiff was classified as a C-5 (maximum) inmate, the highest security classification in New Hampshire, and was assigned to a "special housing unit" as that term was used by New Hampshire correctional officials, resulting from the plaintiff's assault on a correctional officer where he stabbed the officer near the eye with a fork. See Disciplinary Records appended hereto as Ex. 3.

After his placement in the special housing unit in New Hampshire, the plaintiff again received discipline after he grabbed a correctional officer's keys and used the keys to unlock his handcuffs. On another occasion, the plaintiff assaulted several correctional officers as they attempted to remove his handcuffs, kicking and attempting to bite the officers. In addition, the plaintiff's New Hampshire disciplinary history includes punishment for: threatening persons with bodily harm; having drugs in his urine; possession of escape implements; possession of a

weapon; disruptive conduct; fighting; and causing bodily injury. See Disciplinary Records appended hereto as Ex. 3.

On or about December 18, 1997, a representative of the New Hampshire interstate compact office wrote to Lynn Milling, a DOC Major who supervises Connecticut's interstate compact agreements, requesting that Connecticut accept the plaintiff as a transferee under the Compact. A Corrections Compact Referral Summary prepared as part of the transfer request indicates that plaintiff "needs a fresh start" and is having "difficulty adjusting to current incarceration." See New Hampshire Referral Summary, Ex. 4.

Upon his arrival in Connecticut on February 23, 1998, the plaintiff was assigned to the Walker Reception and Special Management Unit for intake purposes, and three days later, sent to Northern CI, placed on administrative detention status pending an administrative segregation hearing. See DOC RT60 Record of Inmate Movements, Ex. 5. Connecticut DOC maintains several different restrictive housing alternatives for its inmate population. The most restrictive, administrative segregation, is designed to safely manage inmates who are classified as threats to staff, other inmates or facility security. In order for an inmate to be placed in administrative segregation, a hearing must be held to give the inmate an opportunity to rebut the reasons for his placement, and approval for placement on this status must come from the Director of Offender Classification and Population Management, or a higher authority within DOC. Inmates assigned to administrative segregation can remain on that status indefinitely until their behavior changes to a degree that placement in a general inmate population becomes appropriate. Inmates on administrative segregation are reviewed for reclassification every seven days for the first two

months and every thirty days thereafter, and may be released from this status only by approval of the Commissioner of the DOC or his designee. The plaintiff remained on administrative segregation during much of the time he spent at Northern. See DOC Restrictive Housing Status Chart, Ex. 6.

Over time, the plaintiff progressed through the various phases of the administrative segregation program, and was transferred from administrative segregation to the general population at MacDougall Correctional Institution on October 5, 2000. From March 23, 2001 until the present, except for periods when he returned to New Hampshire to attend to legal matters in his home state, Mr. Reid has been housed at several Level 4, maximum security facilities in Connecticut. See RT60, Ex. 5. The inmate housing records for Mr. Reid show frequent returns to his home state to attend to legal matters. See RT60 Record of Inmate Movements, Id. Notably, even though he was able to progress out of the administrative segregation program, Mr. Reid continued to engage in violent, disruptive behaviors. On February 14, 2000, Mr. Reid assaulted his cellmate at Northern, resulting in administrative sanctions. See Incident Report and Disciplinary Report, Ex. 7. Thereafter, Mr. Reid repeatedly assaulted a fellow inmate, punching the inmate with closed fists in the head and face. See RT 67 Inmate Disciplinary Report, Ex. 8; Incident Report and Disciplinary Report, Ex. 9.

In addition to the challenges posed to correctional officials by his violently assaultive history, Mr. Reid has a history of a sexual offense. Mr. Reid is classified as having a sexual risk score of 3, which means that he may only be placed in a halfway house with the consent of the DOC Commissioner. Currently, it is the practice of the DOC not to allow individuals with a

sexual risk score of 3 or above to be placed in the community. See affidavit of Lynn Milling, Ex. 2 at ¶ 13. With a current maximum release date in 2019, no firm parole date from the New Hampshire Board of Parole and a significant history of assaultive behavior, Mr. Reid was considered by Connecticut DOC officials to be a maximum security inmate, and therefore was held in maximum security facilities. Milling Affidavit, ¶ 10.

Although the plaintiff was a sentenced inmate from the State of New Hampshire, the plaintiff was subject to the inmate classification, discipline and general custody rules of the Connecticut Department of Correction during the time he spent in Connecticut correctional facilities. The Contract for the Implementation of The Interstate Corrections Compact between the states of Connecticut and New Hampshire expressly provides that:

> It shall be the responsibility of the administration of the institution in the receiving state to confine inmates from a sending state; to give them care and treatment, including the furnishing of subsistence and all necessary medical and hospital supplies; to provide for their physical needs; to make available to them programs of training and treatment which are consistent with their individual needs; to retain them in safe custody; to supervise them; to maintain proper discipline and control; to make certain that they receive no special privileges and that the sentences and orders of the committing court in the sending state are faithfully executed. But nothing herein shall be construed to require the receiving state or any of its institutions to provide treatment, facilities or programs for any inmate confined pursuant to the Interstate Corrections compact which it does not provide for similar inmates not confined pursuant to said Compact.

The Contract further provides that all inmates "while in the custody of the receiving state shall be subject to all the provisions of law and regulations applicable to persons committed for violations of law of the receiving state not inconsistent with the sentence imposed." Interstate Compact—Implementation Contract, Ex. 10 at pp. 2, 4. The Connecticut DOC inmate

classification guidelines prohibit incarceration of individuals with the plaintiff's history and present duration of sentence in a less secure environment. See Affidavit of Major Lynn Milling, Ex. 2 at ¶ 12. With respect to inmates transferred from New Hampshire to other jurisdictions, the New Hampshire DOC's inmate classification procedures defer authority to make such classifications to the receiving state. See Relevant Portions of New Hampshire Classification Manual, Ex. 11 at p. 2.

The remaining claim in this case arises from the plaintiff's subjective and unilateral belief that he would have been released on parole but for the classification decisions of one or more of the defendants. Contrary to plaintiff's assumptions regarding parole, it is clear that, under New Hampshire law, the plaintiff has no right to parole. It is undisputed that the plaintiff has been denied parole on one occasion, and that he has been informed by the New Hampshire Adult Parole Board that he will not be considered for parole until he obtains a halfway house placement and completes anger management classes. See Parole Board Decision, Ex. 12. Mr. Reid also has been advised that a reduced custody level is viewed by New Hampshire authorities as a "privilege." See 3/6/03 Letter from Denise Heath to Plaintiff, Ex. 13. In addition to applicable case law, cited below, and the communications from the New Hampshire Parole Board to the plaintiff, it is undisputed, as a matter of fact, that the plaintiff is not entitled to parole in New Hampshire. See Affidavit of John F. Eckert, Ex. 14 at ¶ 4. Moreover, under New Hampshire law, the decision to release any convict on parole is a purely discretionary matter, with that discretion resting solely with the New Hampshire Adult Parole Board. See Id. at ¶¶ 2, 3; New Hampshire Code of Administrative Rules for Adult Parole Board, Part 301, appended hereto as

Ex. 15.  Thus, the plaintiff has nothing more than a unilateral expectation of parole release. Indeed, despite the fact that Mr. Reid returned to New Hampshire on February 13, 2006, he remains under the jurisdiction of the New Hampshire Department of Corrections and is housed in a community corrections facility.  See NH DOC Inmate Finder Report, Ex. 16.

Ignoring his own violent and harmful acts both in and outside of prison, and asking this court to do the same, Mr. Reid maintains this action, alleging that his classification while an inmate in Connecticut somehow deprived him of his right to equal protection in violation of the Fourteenth Amendment.  As shown below, the defendants are entitled to summary judgment on this claim.

## II.  ARGUMENT

### A.  Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. §56(c).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). *See also, Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir. 1985) (per curiam).  A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986) *cert denied* 480 U.S. 932, 107 S.Ct. 1570 (1987).  The party opposing a motion for

summary judgment "may not rest upon the mere allegation or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. §56(e).

In discussing the history and propriety of summary judgment motions, the Supreme Court has explained:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule Civ. Proc. 1 ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

A party is not permitted to create his own "genuine" issue of fact simply by presenting contradictory or unsupported statements. *See Securities and Exchange Commission v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir. 1978). Thus, "[w]here the record could not lead a rational trier of facts to find for the nonmoving party, there is then no 'genuine issue for trial.'" *Clements v. County of Nassau*, 835 F.2d 1000, 1004 (2d Cir. 1987). The record in this case, even when considered in a light most favorable to the plaintiff, fully supports the granting of summary judgment in favor of the defendants.

### B. Plaintiff Cannot Establish That The Defendants' Classification Decisions Violated His Equal Protection Rights

The remaining claim in this action asserts that the plaintiff's housing in a high security facility deprived him of his equal protection rights. Such a claim is unsupported by any evidence and without merit as a matter of law.

The Fourteenth Amendment to the United States Constitution declares that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 87 L.Ed.2d 313, 105 S.Ct. 3249 (1985*). See also, Smith v. U.S. Parole Commission,* 814 F.Supp. 246, 247 (D.Conn. 1993) (The essence of equal protection is that persons similarly situated with respect to challenged government action shall be treated similarly). Of course, the government can treat persons differently if they are not "similarly situated**.**" *Able v. United States,* 155 F.3d 628, 631 (2d Cir. 1998); *see also Schweiker v. Hogan,* 457 U.S. 569, 590, 73 L. Ed. 2d 227, 102 S. Ct. 2597 (1982). The Fourteenth Amendment does not provide that all people must be treated identically. *Smith, supra,* 814 F.Supp. at 247, *citing Lombard v. Board of Education of the City of New York,* 645 F. Supp. 1574, 1581 (E.D.N.Y. 1986).

The Supreme Court made clear in *Villa*g*e of Willowbrook v. Olech,* 528 U.S. 562, 145 L.Ed.2d 1060, 120 S.Ct. 1073 (2000), that a party can bring an equal protection claim by alleging one has "been intentionally treated differently from others similarly situated and that there is no

rational basis for the difference in treatment." *Id.* at 564. When determining whether a particular government action violates the Equal Protection Clause, a court generally considers whether the disparate classification at issue bears some rational relationship to a legitimate government interest. Only when the challenged classification infringes upon a fundamental right or is directed at a suspect class does the court apply a stricter level of review. *See Phyler v. Doe,* 457 U.S. 202, 216-18, 102 S.Ct. 2382, 2394-95, 72 L.Ed.2d 786 (1982); *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). Regardless of the level of scrutiny to be applied, however, to support a claim under the Equal Protection Clause, the plaintiff must establish that the challenged government action adversely affected *some* identifiable group of which the plaintiff is a member. *Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

There are several ways for a plaintiff to show intentional discrimination that violates the Equal Protection Clause. A plaintiff could point to a law or policy that "expressly classifies persons on the basis of race" or some other prohibited basis for discriminatory treatment. *Id.* (*citing Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 213, 227-29, 132 L.Ed.2d 158, 115 S.Ct. 2097 (1995)). Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. *See Yick Wo v. Hopkins,* 118 U.S. 356, 373-74, 30 L.Ed. 220, 6 S.Ct. 1064 (1886). A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264-65, 50

L.Ed.2d 450, 97 S.Ct. 555 (1977); *Johnson v. Wing,* 178 F.3d 611, 615 (2d Cir. 1999) *cert. denied* 528 U.S. 1162, 120 S.Ct. 1177 (2000).

When pleading a violation of the Equal Protection Clause on the basis of the second theory -- *i.e.,* that the defendants unlawfully applied a facially neutral law or policy to the plaintiff in a discriminatory manner without a rational basis for so doing -- the courts engage in a two-step analysis to determine whether a plaintiff has properly alleged a cause of action. First, the court must determine from the pleadings whether it can adequately identify the group with which the plaintiff claims to be similarly situated. Only after the group to which the plaintiff is similarly situated has been identified can it then be determined whether the complaint sufficiently pleads disparate or discriminatory treatment absent a rational basis in violation of the Equal Protection Clause -- the second criteria. *See, e.g., Congregation Kol Ami v. Abington Twp.,* 309 F. 3d 120, 137-38 (3rd Cir. 2002), *citing City of Cleburne, supra,* 473 U.S. at 447-50. This is the test adopted by the Second Circuit. *See Jankowski-Burczyk v. INS,* 291 F.3d 172, 176 (2nd Cir. 2002). *See also, Brown v. City of Oneonta,* 221 F.3d 329, 337 (2nd Cir. 1999), *reh. denied,* 235 F.3d 769 (2nd Cir 2000) *cert. denied* 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed 2d 16 (2001); *Hayden v. County of Nassau,* 180 F.3d 42, 48 (2nd Cir. 1999). For example, if a plaintiff seeks to prove selective prosecution on the basis of his race, he "must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong,* 517 U.S. 456, 465, 134 L.Ed.2d 687, 116 S.Ct. 1480 (1996).

> [T]o succeed on a class of one claim, a plaintiff must establish that (i) no rational person could disregard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of

a legitimate governmental policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006).

Here, the plaintiff cannot produce any evidence to show that his equal protection claim meets any of the tests set forth above. Specifically, to support his equal protection claim, plaintiff sets forth only the conclusory allegation that defendants deprived him of equal protection of the laws. Plaintiff has not alleged anything that would support a claim that he was treated differently from similarly situated individuals without any rational basis for the said discrimination. Indeed, plaintiff fails to describe with any degree of particularity just to which group he is similarly situated. Equally important, plaintiff has not articulated or alleged why and/or how he believes he was treated differently. Quite simply, plaintiff has not set forth any facts that would support an equal protection claim. In contrast, the defendants have attached hereto the considerable disciplinary record amassed by the plaintiff both in his home state and in Connecticut, including the many, violently criminal, acts committed by the plaintiff that resulted in his lengthy incarceration. Absent some showing by the plaintiff that correctional officials lacked a rational basis for incarcerating him in the facilities they chose to secure others from the plaintiff's particularly violent behaviors, the plaintiff's equal protection claim fails and the defendants' motion for summary judgment should be granted.

### C. Plaintiff Had No Liberty Interest Or Fundamental Right To Any Particular Classification While An Inmate Here in Connecticut

In considering the plaintiff's equal protection claims, it is critical to note that the plaintiff had no constitutional right to be classified or housed in any correctional facility. Indeed, he had no right to even be housed in his home state. The broad discretion given to correctional officials to manage inmates, particularly those with considerably violent records such as the plaintiff here, underscores the lack of merit to plaintiff's equal protection claim.

Generally prisoners have no right to challenge their assignment to a particular facility. *See Prins v. Coughlin*, 76 F.3d 504, 507 (2d Cir. 1996) *citing Meachum v. Fano*, 427 U.S. 215, 225 (1976). As the United States Supreme Court made clear in 1976 in *Moody v. Daggett, supra*:

> [N]o due process protections were required upon the <u>discretionary</u> transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a 'grievous loss' upon the inmate. <u>The same is true of prisoner classification and eligibility for rehabilitative programs.</u> . . . and petitioner has no legitimate or statutory or constitutional entitlement sufficient to invoke due process.

429 U.S. at 88, n. 9 (emphasis added). The Connecticut Supreme Court has likewise stated unambiguously and admitting no exception: "Prison classification and eligibility for various rehabilitation programs, wherein prison officials have full discretion to control those conditions of confinement, do not create a statutory or constitutional entitlement sufficient to invoke due process." *Wheway v. Warden*, 215 Conn. 418, 431 (1990) (emphasis added), *citing Moody, supra, and Meachum v. Fano*, 427 U.S. 215 (1976).

In *McKune v. Lile*, 536 U.S. 24 (2002), the Supreme Court upheld the validity of Kansas' sex offender treatment program against a challenge that the program violated an inmate's Fifth Amendment right against self-incrimination. As part of the Kansas sex offender treatment program, participating inmates were required to complete a sexual history form detailing all prior sexual activity including uncharged criminal offenses. *Id*. at 30. The form was not confidential, and release of information on the form and subsequent prosecution for the uncharged offenses was a possibility. *Id*. If the inmate refused to participate, his classification level was changed, and he was subject to the following:

> [His] visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to personal television, and other privileges *automatically* would be curtailed. In addition, [the inmate] would be transferred to a maximum-security unit, where his movement would be more limited, he would be moved from a two-person to a four-person cell, and he would be in a potentially more dangerous environment.

*Id.* at 30-31 (emphasis added).

In rejecting the inmate's Fifth Amendment challenge, the Supreme Court stated that not only did the circumstances described above fail to comprise a Fifth Amendment claim but that ***they failed to even constitute a liberty interest sufficient to invoke due process***. *Id*. at 37-42 (emphasis added). In so ruling, the Supreme Court, as the ultimate authority on constitutional issues, noted that its own decision in *Sandin v. Conner* dictates the standard to be applied in determining when a liberty interest sufficient to invoke due process exists in a deprivation alleged with regard to challenged prison conditions. *Id*. at 37. "[T]he Court held in <u>Sandin</u> that challenged prison conditions cannot give rise to a due process violation unless those conditions

constitute 'atypical and significant hardships on inmates in relation to the ordinary incidents of prison life.'" *Id., quoting Sandin v. Conner,* 515 U.S. 472, 484 (1995).

Applying the *Sandin* analysis for when and if a liberty interest exists to the question of Fifth Amendment compulsion, the Supreme Court stated in *McKune* that, "The *Sandin* framework provides a reasonable means of assessing whether the response of prison administrators to correctional and rehabilitative necessities are so out of the ordinary that one could sensibly say they rise to the level of unconstitutional compulsion." *Id*. at 41. In finding that the change in classification in *McKune* did not constitute a liberty interest under its decision in *Sandin*, the Supreme Court reasoned as follows:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. . . . ***To respect these imperatives, courts must exercise restraint in supervising the minutiae of prison life.*** *. . . It is well settled that the decision where to house inmates is at the core of prison administrators' expertise. The Court has considered the proposition that a prisoner in a more comfortable facility might begin to feel entitled to remain there throughout his term of incarceration. The Court has concluded, nevertheless, that this expectation "is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all. . . .*
>
> *Respondent also complains that he will be demoted from Level III status to Level I status as a result of his decision not to participate. This demotion means the loss of his personal television, less access to prison organizations and the gym area; a reduction in certain pay opportunities and canteen privileges, and restricted visitation rights. . . . The Constitution accords prison officials wide latitude to bestow or revoke these prerequisites as they see fit. Accordingly,* <u>Hewitt v. Helms,</u> *459 U.S. 460, 467 (1983) held that inmate's transfer to another facility did not in itself implicate a liberty interest, even though that transfer resulted in the loss of "access to vocational, educational, recreational and rehabilitative programs."*

*Id*. at 39-40 (emphasis added).

The analysis the Supreme Court mandates in a number of decisions, not the least of which is *Sandin, supra*, is whether harm suffered by the inmate in the alleged deprivation of due process resulted in a "relevant actual injury" cognizable by the court. *See Lewis v. Casey*, 518 U.S. 343, 351 (1996) (discussing relevant injury rule). Indeed, the ruling of *Sandin* was that, even were the process leading up to a correctional decision faulty, unless the ultimate decision or impact on the inmate exceeded the expected circumstances in "an unexpected manner", there is no cognizable liberty interest. *Sandin*, *supra,* 515 U.S. at 484. *Sandin* reiterated that the Due Process Clause itself does not create a liberty interest in being free from 'every change in the conditions of confinement having a substantial adverse impact on the prisoner" or from transfers from cell to cell within a prison, so long as conditions remain "within the normal limits or range of custody which the conviction has authorized the State to impose." 515 U. S.  at 478.

*Sandin* makes clear that it is not for the courts to delve into the decision-making process that leads to an acceptable, constitutional result. Indeed, far more adverse circumstances than a transfer to a medium security prison are held to invoke no liberty interest, and thus no procedural due process protections. Indeed, a transfer to the highest level security, administrative segregation is considered to fall within the "normal range of custody." *Sher v. Coughlin*, 739 F.2d 77, 80-81 (2d Cir. 1984). Thus, it is well settled that inter-prison transfers fall within that range, *Meachum v. Fano*, 427 U.S. at 224-25, as do inter-state prison transfers. *Olim v. Wakinekona*, 461 U.S. 238 (1983).

Here, plaintiff alleges that he was not transferred to lower-security facilities despite the general language of correctional policies that made him eligible for such a transfer. Critically, the plaintiff does not identify any conditions to which he was subjected that differed in any meaningful way from those endured by any other medium or maximum security inmate. Because the plaintiff cannot adduce facts to suggest that he was subjected to atypical and significant deprivation, or to otherwise question the rationale of the classification decisions of the correctional officials named as defendants in this action, the defendants are entitled to summary judgment.

### III. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment should be granted.

DEFENDANTS:

JOHN ARMSTRONG, ET Al.,

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:    /s/ Terrence M. O'Neill
       Terrence M. O'Neill
       Assistant Attorney General
       Federal Bar No. ct10835
       110 Sherman Street
       Hartford, CT 06105
       Tel.: (860) 808-5450
       Fax: (860) 808-5591
       Email: terrence.oneill@po.state.ct.us

## CERTIFICATION

I hereby certify that on November 19, 2007, a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

      /s/ Terrence M. O'Neill
Terrence M. O'Neill
Assistant Attorney General
Federal Bar No. ct10835
110 Sherman Street
Hartford, CT 06105
Tel.: (860) 808-5450
Fax: (860) 808-5591
Email: terrence.oneill@po.state.ct.us